# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00569-CV

---

**Ashley Szymonek and Paul Szymonek, Appellants**

**v.**

**Arturo Guzman and The Law Office of Art Guzman, Appellees**

---

**FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
NO. 20-1430, THE HONORABLE MARGARET G. MIRABAL, JUDGE PRESIDING**

---

## O P I N I O N

This proceeding originated in July 2020, when appellees Arturo Guzman and the Law Office of Art Guzman (collectively, Guzman) filed a petition for presuit depositions under Rule 202, seeking to depose Ashley Szymonek and Paul Szymonek,[1] attaching supporting documents to establish that depositions were warranted. *See* Tex. R. Civ. P. 202 (party may petition to take deposition to investigate potential claim or suit). Guzman alleged that Ashley, who had been his paralegal and sole employee for about ten years, had committed "multiple deceptive, fraudulent, and illegal acts," including stealing from his law practice and failing to respond to a client complaint—leading to his disbarment.[2] He further alleged that Ashley then told people that Guzman was depressed and not taking care of his law practice in an attempt to

---

[1] Because appellants share a last name, we will refer to them individually by their first names and collectively as "the Szymoneks."

[2] Guzman states in his brief that he has since been reinstated.

lay the groundwork for people to believe he had committed suicide when she attempted to poison him with antifreeze in April 2020. The Szymoneks filed a motion to dismiss under the Texas Citizens Participation Act (TCPA),[3] *see* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011, but the trial court denied the motion.

In September 2020, Guzman filed an amended petition, changing the nature of the proceeding from a Rule 202 proceeding to a lawsuit alleging claims against the Szymoneks for assault and battery, invasion of privacy, libel and slander, common law fraud and conversion, and breach of contract.[4] The Szymoneks filed another motion to dismiss under the TCPA, again asserting that the TCPA applied to all of Guzman's claims and that Guzman could not present a prima facie case as to each element of each of his claims. Guzman filed essentially the same response, asserting that the Szymoneks had not established that the TCPA applied and that he had presented a prima facie case of each his claims in his petition and accompanying documentation. The trial court again denied the motion to dismiss, and this appeal followed.

### SUMMARY OF THE FACTUAL ALLEGATIONS

Because this appeal requires us to determine whether the TCPA applies to Guzman's claims and, if so, whether Guzman presented a prima facie case for those claims, we first summarize the accusations leveled against the Szymoneks in Guzman's petition and the supporting evidence attached to the petition.

---

[3] The Szymoneks also filed an objection to the petition, but the record does not reflect whether the trial court ruled on that objection.

[4] Although the record does not contain any documents memorializing an agreement, Guzman asserts that "the 202 motion was turned into a 'regular' lawsuit" pursuant to an agreement between the parties.

Ashley was Guzman's paralegal and sole employee for about ten years, managing the law firm's day-to-day business, handling its Interest on Lawyers Trust Accounts (IOLTA) and other bank accounts, and maintaining his malpractice insurance. She was also the firm's primary contact for bankers, accountants, and others, and her personal email was used for much of the firm's electronic correspondence, including bank notifications. In addition to building Guzman's confidence in the business environment, Guzman said, she became his "right-hand person" and his "ride-or-die" in personal matters as well, helping him adjust after his divorce from Valarie Guzman[5] in 2012 and building close relationships with his children.

In mid-2019, Guzman and Valarie agreed that he would buy out her interest in an office building they had bought as an investment for their children's future educational needs. During that process, he learned that he had been a victim of identity theft and that his social security number had been used to open a new credit card and was told he could not refinance until "the fake identity was removed from" the credit-reporting agencies.

In May 2019, Guzman learned that a former client, Victor Balderas Zubieta, had filed suit asserting that Guzman had improperly withheld his funds, and in October 2019, he learned that Balderas Zubieta had also filed a grievance against him with the State Bar of Texas. Guzman had obtained $197,000 in real estate funds for Balderas Zubieta, who asked that the funds be paid through "multiple smaller checks," and in September 2018, Ashley had issued from Guzman's IOLTA account seven $25,000 checks and an eighth for $22,000. Balderas Zubieta asserted that when he attempted to cash the checks in March 2019, there were

---

[5] Valarie had been heavily involved in managing the law firm and helped train Ashley. After their divorce, Valarie and Guzman remained friendly and maintained some financial ties.

3

insufficient funds to cover the last two checks, but Ashley gave Guzman copies of eight cleared checks, saying she had gotten them directly from Guzman's bank.

Guzman filed a pro se answer in the former client's lawsuit and asked Ashley to contact his malpractice carrier to have an attorney assigned to represent him. Although Guzman unsuccessfully tried to meet with the malpractice attorney whom he believed had been assigned to his case, Ashley repeatedly told Guzman that she was in contact with his malpractice carrier and said that his attorney would be filing a motion for summary judgment on his behalf. In April 2020, however, he checked the Hays County website and learned that a default summary judgment had been taken against him on March 12, 2020. Guzman did not understand how such an action had occurred because he believed he had counsel representing him, so he emailed the malpractice attorney to ask how his carrier was going to remedy the situation. Ashley then told Guzman that she had scheduled an April 28 phone meeting between him and that attorney.

In the grievance proceeding, Guzman drafted an answer and believed Ashley had emailed it to the State Bar, along with responses to and requests for disclosure and documents related to his IOLTA account. Guzman believed he was "fully engaged" in the proceeding and wondered why the State Bar continued to pursue the matter despite his providing documentation related to his IOLTA accounts and rebutting the grievance. On February 26, 2020, Guzman was disbarred but he did not learn of it until several weeks later, when one of his tenants told him. Guzman contacted the State Bar and was told "that it had been a default judgment and that he would have to file a motion for a new trial." Guzman was confused because he had in his files what he believed to be a file-stamped copy of his answer, but he prepared a motion for new trial, asking Ashley to file it. Ashley told Guzman that he had an appeal hearing set with the State Bar—she first said that he had a hearing set for March 18, 2020, but on March 17 said that it had

4

been rescheduled to March 31; on March 31, she said that it had been rescheduled to April 10; on April 9, she told Guzman that the hearing was rescheduled to April 24; and on April 24, she said that the hearing was reset for April 29.

Finally, Guzman's new wife Shelly received an inquiry from the Internal Revenue Service about some of their tax returns, and Guzman tried unsuccessfully to reach his accountant, Dax Verleye. Ashley offered to get Guzman's bank records related to tax payments and said she had set up an April 28 phone call with Verleye to "get it all taken care of."

On the morning of April 28, 2020, Guzman left for the office, telling Shelly that he and Ashley were going to speak to Verleye and the bank about the tax issue and that he was then going to speak with his malpractice attorney. Ashley, who had told him she would have to leave in the early afternoon, met him at the office that morning, and Guzman asserted that he "does not remember very much past the first half hour or so from that day." No one could reach him by phone that day, and he did not go home that night. Shelly texted and called throughout the day, and although Guzman responded to her texts, his responses "were short and dry which [Shelly] said was out of character for him." Shelly spoke to Ashley, who said "she and [Guzman] had a talk about him closing the office down and they were very emotional, lots of tears, and he went for a walk." Ashley told Shelly that she had stayed at the office with Guzman until 7:30 p.m. and that when she left, he was "ok but probably just tired." Shelly, who cannot see well at night and lives more than an hour away from Guzman's office, asked Ashley to check on Guzman, but Ashley "was very unconcerned and said that her family was going to bed and not to worry. She convinced Shelly that [Guzman] was fine and he just needed to rest."

When Shelly called Guzman the next day, on April 29, she again got no response, nor did Valarie or her daughter Madison when they tried to check in about the State Bar appeal

hearing they believed had been scheduled for that morning. Madison called Ashley, who told Madison that Guzman had "blurt[ed] out he was closing the office" the day before. Ashley claimed that she "was completely blind-sided" when Guzman "broke the news that she would need to find a new job"[6] and that she had spent most of April 28 "crying and having an emotional goodbye" with Guzman. She said that the news "was both shocking and devastating to her" and that she and Guzman had spent the day going for a walk, discussing the future, and having "casual conversations about the news, politics, and other typical topics." Ashley told Madison that Guzman "seemed perfectly healthy" but was "adamant about shutting down the office and making that day their 'final goodbye.'" Ashley also said that she went to the office on the morning of April 29 and found Guzman "asleep on the couch, snoring loudly." He did not want to wake up when she tried to do so and refused her offer of coffee, so she left him sleeping on the couch. When Madison asked about Guzman's hearing, Ashley confirmed that it was supposed to be that morning but said that Guzman "was sick," "was 'just so checked out,'" and said he "could have the office sold by June." When Valarie texted Ashley to ask if Guzman was okay, Ashley said that he "had been depressed a long time" but not to a level that required urgent attention. However, Valarie was concerned because Ashley "describe[d] a very sick person who could not be woken up for an important event" but had left him alone and had not notified family members whom Ashley knew well and knew how to contact.

Madison went to Guzman's office but found that all the locks had "broken keys in them." Guzman did not answer the door despite her knocking loudly on the doors and windows,

---

[6] Guzman later learned that Ashley had accepted a job with another law firm, telling that firm that she could start work on April 27 but that she needed April 28 and 29 off due to prior commitments she had with her son. However, on April 29, Ashley told Valarie that her son was in Dallas with his grandmother and would not be home until May 2.

so Madison texted Ashley for the office's key code. When she entered, she found Guzman "snoring very loudly and in an odd manner that was unlike anything Madison had seen from her father." His face "was bloated, and vomit was coming out of his mouth," so she tried unsuccessfully to shake him awake and then called 911. When Guzman arrived at the hospital, his body temperature was dangerously low, his organs were shutting down, and the doctors suspected he had been poisoned. While his family members waited at the hospital, they were informed by the police that there were two warrants out for Guzman's arrest for theft from a client, but Ashley claimed not to know anything about it. Doctors determined that Guzman had most likely been poisoned by "antifreeze that was ingested in a large amount." He remained in a coma for several days, and as he regained consciousness, he initially refused to speak to Ashley but would not say why. However, he called on May 5 to ask her to help Valarie at the office, and although Ashley said she would help, she called him "Mr. Guzman" instead of "Art," which she had never done before. Moreover, when Valarie contacted Ashley, she claimed "to not know anything about anything going on at the office." At that point, Guzman said, he knew "Ashley was hiding something and she was most likely responsible for his poisoning."

Madison went to Guzman's office on May 5 and discovered that a trial notebook related to his grievance proceeding was missing, along with "a lot of other files," checkbooks, receipt books, emails, and other electronic data. She also found about eighty filters and blocks in his office email system—filters and blocks that "would catch any email traffic from his banks, accountants, The State Bar," and the State Bar's representative, along with email related to his former client. Guzman eventually determined that files, contacts, and billing records "had been deleted from all office computers over a period of months," an act which required "intentional access and removal of client data from multiple programs."

7

The family had Guzman's bank accounts frozen and requested records for the last two years. They also changed the locks on Guzman's and Ashley's offices but on May 7 discovered that someone had accessed a computer on a secretary's desk and server, both located in the building's main lobby, and had deleted thousands of files. It was not until May 8 that the family was able to change all the access points to Guzman's electronic accounts because Guzman was still hospitalized and unable to remember most of his passwords while at the same time Ashley had access to his personal and work email accounts. Further, her personal email and phone number were used as his recovery contacts; she had forwarded the office phones and changed the access passcode; and she continued to access Guzman's DropBox account. On May 8, Valarie spoke to a bank officer about the office building, and the officer told her that "his department had not been able to get in touch with Art via phone, email or certified mail." The property had been posted for foreclosure, and a sale was scheduled for June 2, 2020, but when Valarie explained Guzman's situation, the bank allowed Valarie to refinance, requiring that Guzman be removed from the note and the deed. Finally, on May 29, 2020, someone opened a checking account under Guzman's son's name and social security number and "attempt[ed] to deposit nearly 20K in fraudulent payroll checks," but the bank "flagged the checks and they were not deposited." The bank sent the family copies of the deposit slips, and "[o]ne of the first things that was noticed was [that] the handwriting on the deposit slip looks remarkably like Ashley's handwriting."

Guzman pleaded that since his hospitalization, he had learned that Ashley had been "gossiping and saying very negative things about him for some time," referring to information he had since learned from two tenants in his building. Guzman also asserted that his bank records showed that Ashley "had been diverting client and business funds to use for her

8

own personal gain." Ashley had used Guzman's IOLTA funds for her own personal expenses—even attaching the IOLTA account to her PayPal account—and wrote the eight checks to Balderas Zubieta knowing there were insufficient funds in the account to cover them, while Guzman believed he had paid the client all the money that was owed to him. Guzman alleged that Ashley had also used Guzman's office-only credit card for her personal purposes, arranging to have the statements sent to her personal email address, and that it was she who had obtained the fraudulent credit card in Guzman's name in the identity-theft incident. Guzman calculated that Ashley had spent at least $246,873 for her and Paul's benefit and had not yet determined the amount of additional funds she had spent from another bank account. Guzman further learned that Verleye had not done Guzman's taxes in fifteen years, despite Ashley giving Guzman tax documents with Verleye's name on them and letters with his purported signature.

In the State Bar proceeding, Guzman learned that Ashley had emailed his answer to a misspelled email address, sending it to Marie "Hapsil" at the State Bar instead of Marie Haspil, and then forwarded the email to her personal email address without any attachments and deleted it from the law firm's email account. None of the documents he thought he had provided to the State Bar were ever sent, and among the thousands of emails deleted from his office account, were "all of the responses and requests he prepared," an eFile notice of the State Bar's motion for summary judgment, and at least three other emails related to the case. Moreover, Ashley never filed his motion for new trial, and no appeal hearing was ever scheduled.

As for the Balderas Zubieta lawsuit, the family learned that Guzman did not have a malpractice carrier or attorney—Ashley had allowed his malpractice insurance to lapse "years ago," and no attorney had ever been assigned to his case. Instead, Ashley had an "auto login" on her computer for an account purporting to be owned by "justin.lsquared@gmail.com," the

9

attorney Guzman thought had been assigned to his malpractice case. In texts between Ashley and Valarie, Ashley denied that she knew anything about Guzman's malpractice attorney or how to contact him.

Guzman attached numerous exhibits to his petitions, including:

- the email purporting to provide Guzman's answer to the State Bar, which was sent to "Marie Hapsil" on November 19, 2019, and then later forwarded from Guzman's work address to Ashley's personal address;

- a May 7, 2020 email stating that a request had been made to remove Ashley's personal email address from Guzman's office email account; Guzman stated that no one in his family had submitted such a request at that point;

- a screen shot of deleted emails that were restored to Guzman's work account, including an eFile notice about the State Bar's motion for summary judgment and several other emails related to the grievance, emails related to an offered forbearance on the office mortgage, and an email sent by a former client on April 14, 2020, at which time Guzman was not practicing law and to which Ashley replied, providing her personal cell phone number and accepting a credit-card payment;

- emails between Ashley and her new law firm on April 23 and 24, 2020, confirming her new job and noting that she could not work on April 28 or 29;

- a list of filters placed on Guzman's personal email account, resulting in the deletion of certain emails, including any from Guzman's bank;

- a list of filters placed on Guzman's work email account, resulting in emails from Marie Haspil, Guzman's bank, his accountant, the State Bar, the judge overseeing Balderas Zubieta's lawsuit, and numerous other senders, along with emails containing words such as "court," "bar," "case," or "judge," being deleted or placed into folders other than the inbox;

- texts between Guzman and various friends and family members starting in mid-March 2020, first expressing confusion and grief about his disbarment and then giving them updates about his State Bar appeal hearing and its numerous delays;

- receipts dating to early 2017 showing that Ashley used the credit card fraudulently obtained through the identity-theft incident to buy herself items like plane tickets, a YMCA membership, a photo booth for a party, and concert tickets;

- the Gmail inbox page for "justin.lsquared@gmail.com," opened on Ashley's work computer and containing Guzman's April 14 email, which demanded answers related

10

to the default summary judgment entered against him in Balderas Zubieta's lawsuit, along with a copy of that email from Guzman;

- a copy of an email sent to Ashley by the owner of the company where Ashley's husband worked, which asked, "Did you just do a Yelp review? from Justin?," and Ashley's response, "Yep that was me :)";

- a copy of the company's Yelp page showing a positive review by "Justin L." in San Francisco, complimenting the work done by "Paul," directly below a positive review by "ashley y."[7] in Austin;

- correspondence between CPA Verleye, Guzman, and Valarie in April and May 2020, in which Guzman and Valarie requested information about the family's tax returns and Verleye replied that he thought Guzman "ha[d] us mixed up with someone else" because, "I have not done any business with you since you left our firm [in 2005] and have never communicated with the IRS on your behalf";

- another email from Verleye dated July 1, 2020, under the subject "Fraud," in which Verleye stated that he had gone back through his files to investigate. He stated that he had not filed a tax return for Guzman or Valarie since taking over his CPA business in 2004 and had never spoken to or corresponded with anyone from Guzman's office, including anyone named Ashley. He offered to prepare a more formal statement about the apparent fraud, noting that he is a Certified Fraud Examiner and saying, "This is so wrong" and "this stuff just makes my blood boil";

- a July 2019 letter purportedly signed by Verleye and written on "Dax Tax Service" letterhead, confirming Guzman's ownership of his law firm, and a 2018 IRS Form 1040 for Guzman and Shelly, which Ashley gave them to sign, and which lists "Dax Verley" as having prepared the tax return;

- a listing of Ashley's alleged uses of Guzman's IOLTA account between March 2018 and May 2020 to pay for more than $246,000 in personal expenses, such as a credit card in Ashley's and Paul's names, concert tickets, travel, and car payments, along with bank records and copies of cancelled checks for those purchases;

- receipts from Ashley's PayPal account, which accessed Guzman's IOLTA account, for items like swimsuits, jewelry, a photo session "with LIVE bunnies," and hotel reservations;

- texts between Guzman and Ashley in April 2020, in which Guzman asked Ashley to check on his State Bar appeal hearing, the malpractice claim, and the building refinancing. Ashley responded that she had done so and variously told Guzman that there had not been any action in the appeal, that she was waiting to hear from the bank on the refinancing, that a new attorney was assigned to the malpractice claim,

---

[7] Ashley's maiden name is York.

11

and the like. On April 27, Ashley texted that on the next day, Guzman had a call scheduled with his malpractice lawyer, that she would show him the copy of his 2018 tax return she had at the office, and that Verleye would call him;

- texts between Ashley and Madison on April 29 in which Ashley said Guzman had been emotional about deciding to shut down his law practice, had slept at the office, and did not want to wake up that morning;

- texts between Ashley and Valarie in the same timeframe, in which Ashley described Guzman's state of mind and said he was giving up his law practice, along with later texts in which Ashley said that she did not know Guzman's bank log-in information, that he always did the bank transactions, and that she did not know anything about his malpractice carrier;

- screen shots that Guzman asserted showed that Ashley had accessed Guzman's files, deleting some of them, while he was in the hospital; and

- documents related to the account opened in Guzman's son's name in May 2020, including the rejected payroll checks and a deposit slip written in handwriting that, Guzman asserts, strongly resembles Ashley's.

Guzman also provided affidavits by two of his former tenants, Case Darwin and Naomi Medina. Darwin, an attorney, averred that he had rented his office from Guzman for about three years and was "very familiar" with Ashley and had a good relationship with her. In early March 2020, he learned that Guzman had been disbarred when he called a trial court to ask if Guzman could appear for him in a hearing. Darwin was confused both because Ashley had just told him Guzman could appear in the hearing and because only days earlier, Guzman "was working just like he had always done. Things could not have been more normal." Darwin told Medina and another tenant about the disbarment, and they all decided to call Guzman to "find out whether [they] should start looking for other space to rent." Medina called Guzman on speaker phone, and Darwin averred that Guzman "seemed genuinely surprised" to hear he had been disbarred. He kept asking where Darwin had heard that information and "seemed to be taking it hard and was in shock."

Darwin said that after his and Medina's call with Guzman:

12

Ashley started telling me that [Guzman] had mental issues, [was] suicidal, taking drugs and drinking. I did not know what to make of that because I never saw [Guzman] high on drugs, drinking, smell alcohol on his breath or seem depressed. I could not understand why [Guzman] was disbarred. He never came across to me that he was a thief. Ashley continued to repeat these same allegations to me during the month of April that [Guzman] was depressed, suicidal, taking drugs and drinking. Looking back on it now, there is no doubt in my mind that Ashley was planting a seed why [Guzman] would commit suicide.

The week before April 28, Darwin saw Guzman at the office, and Guzman "was not making any statements about depression, suicide nor did he appear high on anything." He insisted that it was not he who had been disbarred but another lawyer and that he was "going to get everything straightened out with the Bar." On April 28, Ashley told Darwin she had taken a new job, and Darwin averred, "I am not one hundred percent certain, but on April 28th, Ashley is repeating the same allegations about Art's mental state and drug use." Darwin did not see Guzman that day, but he saw Guzman's car and said Ashley and Guzman were still there when he left at about 4:00 to 5:00 p.m. He "found it odd that both Ashley and [Guzman] were still at the office because he had been disbarred. I could not imagine what they could be doing."

Darwin stated that about a week after Guzman was hospitalized, Ashley talked to Darwin about "the money taken from a client" and said she was worried about theft allegations. Darwin responded "that if I was [Guzman's] lawyer I would be focused on her since she manages [Guzman's] checkbook and I would want to know everything Ashley had been doing." At that, Ashley went into her office, and Darwin heard her throwing up in her wastebasket. He "thought her reaction was odd" but did not yet suspect that she had been stealing from Guzman. Darwin also stated that in February 2020, Ashley had started saying she wanted to work for Darwin, which he believed in retrospect indicated that she "knew that [Guzman] was about to get some type of drastic action from the Bar." Finally, Darwin said that while he was in trial in

13

March 2020, Ashley told him that a client had left him a $1,500 check and that Guzman's part-time secretary had put it in Darwin's desk. However, he never found the check, and after Guzman's hospitalization, he spoke to the secretary, who said "that there never was a check and that the client had paid cash and that she last saw the cash in Ashley's possession." Darwin averred, "I firmly believe Ashley stole the money from me."

In her affidavit, Medina stated that she had known Guzman for more than twenty-five years and that he was always pleasant and appeared to be "living a wholesome lifestyle." She said Darwin approached her in April 2020, shocked because he had learned that Guzman had been disbarred. She and Darwin called Guzman to express their concern, and Guzman reacted with shock and became "hysterical, upset and told me this was impossible." Guzman contacted her later that day and was crying and "extremely emotional." He "was talking loudly as though he was pleading and attempting to convince me and the others this information was untrue," and told Medina that he had spent twenty-five years building his reputation and that he had not received any information about being disbarred. Medina went to the office on the afternoon of April 29 and noticed that Guzman's office air conditioning was turned on, his car was not parked in its usual spot, the building's air conditioning had been turned down to 67 degrees, all the fans were on, and there was "a very strong odor" that she could not identify but that seemed to her to be "some kind of chemical." She said that Darwin had told her "that Ashley told him [Guzman] had been smoking weed and drinking alcohol, and that he was depressed, so I was predisposed to speculating that [Guzman] had used some kind of substance in the office." She later learned Guzman had been taken to the hospital earlier that day.

14

We construe the TCPA liberally to effectuate its intent of safeguarding and encouraging citizens' constitutional rights to free speech, petition, and association while protecting the right to file a meritorious lawsuit. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam); *see* Tex. Civ. Prac. & Rem. Code §§ 27.002, .011(b). A party seeking dismissal under the TCPA bears the initial burden of demonstrating that the non-movant's "legal action is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association." Tex. Civ. Prac. & Rem. Code § 27.003(a). If the movant makes its initial showing, the trial court must dismiss the action unless the non-movant establishes by clear and specific evidence a prima facie case for each element of its claim. *Id*. § 27.005(b), (c). Even if the claimant puts forth a prima facie case, the trial court must still dismiss the action if the movant "establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id*. § 27.005(d). In making its decision, the trial court "shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id*. § 27.006(a). We review de novo whether the movant demonstrated that the challenged legal action is subject to the TCPA and whether the nonmovant presented clear and specific evidence establishing a prima facie case for each essential element of its challenged claims. *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.).

## DISCUSSION

In their opening brief, the Szymoneks argue that all of Guzman's claims should have been dismissed under the TCPA. In their reply brief, however, they seek dismissal of

15

Guzman's libel, slander, and invasion-of-privacy claims, not his claims for assault and battery, common-law fraud and conversion, or breach of contract. Because the TCPA does not apply to claims for common-law fraud or bodily injury, *see* Tex. Civ. Prac. & Rem. Code § 27.010(a)(3), (12), and because of the Szymoneks' more limited prayer for relief in their reply brief, we will limit our consideration to whether the TCPA applies to Guzman's claims for libel, slander, and invasion of privacy.

The Szymoneks first argue that the TCPA applies because Guzman's "'character assassination' assertion and allegations that the Szymoneks may have committed libel and slander are based on assertions that Ms. Szymonek was communicating with other individuals about various matters, including case-related issues, client matters, and Mr. Guzman's disbarment, as well as 'gossip' that allegedly involved Guzman's well-being."[8] They contend that the statutory phrase "a matter of public concern" "easily" encompasses Guzman's claims or allegations because they arise from "statements, communications, and representations pertaining to improper conduct towards members of the public or the government in relation to legal services to clients, misuse of IOLTA funds, misconduct of attorneys and law offices, payments related to legal services, and the integrity of an attorney who serves the public." We disagree.

The "exercise of the right of free speech" is defined as "a communication made in connection with a matter of public concern," and a "matter of public concern" is a statement or activity regarding a public official, a public figure, or another person "who has drawn substantial

---

[8] In their motion to dismiss, the Szymoneks also asserted that Guzman's allegations of "falsification of invoices, misuse of IOLTA funds, misconduct of attorneys and law offices, and fraudulent communications and payments" were matters of public concern because they "involve public integrity by a licensed attorney as well as economic and community well-being"; that the allegations "also relate to the operation of the government, namely the judiciary"; and that "because the allegations concerning public contracting and representations related to legal services, the allegations also involve services in the marketplace."

public attention due to the person's official acts, fame, notoriety, or celebrity"; "a matter of political, social, or other interest to the community"; or "a subject of concern to the public." *Id*. § 27.001(3), (7). "To be a matter of public concern, a claim must have public relevance beyond the interests of the parties." *Morris v. Daniel*, 615 S.W.3d 571, 576 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Creative Oil & Gas v. Lona Hills Ranch*, 591 S.W.3d 127, 136 (Tex. 2019)). "Private disputes, whether sounding in contract or in tort, that merely affect the fortunes of the litigants are not matters of public concern." *Id*. The TCPA's definition of a "matter of public concern" "more strongly emphasizes the term's public component and thereby furthers the TCPA's stated and unchanged purpose: 'to encourage and safeguard the constitutional rights of persons to . . . speak freely.'" *Chesser v. Aucoin*, No. 01-20-00425-CV, 2020 WL 7391711, at *4 (Tex. App.—Houston Dec. 17, 2020, no pet.) (mem. op.) (quoting Tex. Civ. Prac. & Rem. Code § 27.002). As observed by our sister court, "an attorney's practice of law and all rumors regarding an attorney's possible violation of disciplinary rules" cannot "in all instances" be considered matters of public concern. *Kirby, Mathews & Walrath, PLLC v. Kuiper L. Firm, PLLC*, No. 06-21-00040-CV, 2021 WL 4268291, at *5 (Tex. App.—Texarkana Sept. 21, 2021, no pet.) (mem. op.).

Although this case, unlike *Kirby, Mathew & Walrath*, *id*. at *6, does involve both a grievance proceeding and a civil suit, Guzman has not alleged that Ashley made any statements to the State Bar, to Balderas Zubieta, to law enforcement, or to any other individual or entity that might have been involved in those earlier proceedings. Instead, Guzman's claims are largely based on his allegations of criminal conduct and of Ashley's repeated lies about how she was handling the business of his office. He alleged that Ashley told him: that she had filed documents in his grievance when in fact his answer was never filed, resulting in his disbarment;

17

that she was in contact with his malpractice carrier and malpractice attorney when she had allowed his malpractice insurance to lapse, resulting in a summary judgment being entered against him; that Verleye was handling Guzman's taxes when Verleye had not done Guzman's taxes in more than a decade; and that she was monitoring the progress of the office-building refinancing when instead the bank ended up posting the building for foreclosure when it was unable to reach him. None of those alleged mistruths implicate matters of public concern because, although some of them did affect Guzman's ability to practice law and his ability to defend himself against the claim made by his client, they did not address whether Guzman was competent to practice law or any other issue relevant to the public and only affected matters personal to Guzman and, by extension, his family. *See id.* at *5-6; *Morris*, 615 S.W.3d at 576.

Nor can Ashley's alleged statements to Darwin that Guzman had been abusing drugs and alcohol or to Guzman's family members that he was depressed and had decided abruptly to shut down his law practice be considered as involving matters of public concern. First, those statements were made after Guzman was disbarred and after Darwin learned about the disbarment (a discovery he made after Ashley told him Guzman could cover a hearing for him) and told Guzman about it, at which time Guzman stopped practicing law and started trying to regain his license. Further, it is neither alleged that Ashley reported Guzman to the State Bar or the Texas Lawyers Assistance Program for incompetence, impairment, incapacitation, or fraudulent or illegal behavior, nor that she made any statements to a client, a potential client, or the public at large about Guzman's competence or honesty or even "gossiped" about Guzman's circumstances or behavior in such a way that could be viewed as touching on matters of public concern. The fact that Guzman is asserting defamation claims against Ashley does not mean that the statements on which those claims are based—statements which, as far as Guzman has pled,

18

were either mistruths told to Guzman about the management of his law practice or made to his family members and a tenant after he was disbarred—were communications made in connection with matters of public concern.

We hold that the Szymoneks did not demonstrate that Guzman's claims are based on or in response to the Szymoneks' exercise of the right of free speech.

The Szymoneks further argue that Guzman's claims are based on or in response to their exercise of their right to petition because Guzman's claims "center on alleged communications that [Ashley] made (or, according to [Guzman], represented that she made, but did not make) with various courts and tribunals." First, Guzman does not allege that Ashley actually communicated with the State Bar, a court, or another tribunal, and his claims therefore are not based on or related to any communications Ashley had with "various courts and tribunals." Further, Ashley's alleged failure to file documents in Guzman's grievance procedure and her allowing his malpractice insurance to lapse, resulting in him not putting on a defense in Balderas Zubieta's lawsuit, cannot be viewed as an exercise of Ashley's right to petition. Those acts or omissions occurred as she acted as Guzman's proxy in her role as his paralegal and office manager, not on her own behalf. Even if Guzman had alleged that Ashley had communicated with the State Bar or the trial court, as opposed to her failure to communicate, those alleged communications would have been made in connection with *Guzman's* right to petition. Because Guzman's claims are not based on or in response to Ashley's exercise of *her* right to petition, the Szymoneks did not show that the TCPA applies under that ground. *See* Tex. Civ. Prac. & Rem. Code § 27.003(a); *see also Coleman*, 512 S.W.3d at 898 (party seeking dismissal under TCPA must show claim is based on movant's exercise of constitutional rights).

19

Finally, the Szymoneks argue that the TCPA applies because Guzman's claims are based on or related to their exercise of their right of association because he "asserts in all of the claims that the Szymoneks joined with others to defraud and otherwise unlawfully procure funds from Guzman, as well as associated with a new employer and other individuals in the community." Again, we disagree.

First, as noted earlier, the TCPA does not apply to claims for common-law fraud. *See* Tex. Civ. Prac. & Rem. Code § 27.010(a)(12). Further, we disagree that Guzman's petition "impl[ies] that [Ashley's] employment with another law firm was initially subterfuge to allegedly engage in conduct to further harm Mr. Guzman." Guzman's claims do not complain of Ashley's taking her new job or her association with anyone at the new firm, and his petition includes information about her new job not to support any of his claims but to paint a picture of the circumstances. Guzman's claims are based on Ashley's alleged misrepresentations to him related to the management of his law firm and his legal matters, misuse of his funds for her personal use, participation in identity theft, attempt to poison him to cover up her misdeeds, and statements to Darwin and Guzman's family members that he seemed depressed and was abusing drugs and alcohol. None of Guzman's claims involve the Szymoneks' exercise of their right to "collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern." *See id*. § 27.001(2) (defining "exercise of the right to association"). We hold that the Szymoneks did not establish that the TCPA applies under the right-to-association ground.

The Szymoneks did not demonstrate that the TCPA applies to Guzman's claims against them, and we overrule their first issue on appeal. Because the Szymoneks did not carry their initial burden, the burden never shifted to Guzman to present a prima facie case for the

20

elements of his claims, and we therefore need not consider the Szymoneks' second issue, which contends that he did not carry that burden.

## CONCLUSION

The Szymoneks did not demonstrate that Guzman's claims are based on or related to the Szymoneks' exercise of protected constitutional rights, and the trial court therefore properly denied their motion to dismiss under the TCPA. We affirm the trial court's order denying the Szymoneks' motion to dismiss.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:  February 10, 2022